IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROADGET BUSINESS PTE. LTD., | |
| Plaintiff, | |
| v. | No. 1:22-cv-07119 |
| | Judge Franklin U. Valderrama |
| PDD HOLDINGS INC., et al. | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Roadget Business Pte. Ltd. (Roadget) moves this Court to enter an emergency temporary restraining order (TRO) against Defendants PDD Holdings Inc. (PDD Holdings) and Whaleco, Inc. (Whaleco, collectively with PDD Holdings, Temu), pursuant to Federal Rule of Civil Procedure 65(b), enjoining Temu from ongoing infringement of Roadget's U.S. registered trademarks and copyrights related to Shein and associated brands. For the reasons stated below, the Court grants Roadget's motion for an emergency temporary restraining order.

## Background

Roadget, a private limited company organized under the laws of Singapore, owns numerous U.S. trademarks and copyright registrations associated with Shein, a popular online fashion and lifestyle retailer, and its associated brands SHEIN CURVE, ROMWE, DAZY, EMERY ROSE, SHEGLAM, and LUVLETTE (SHEIN

Marks). R. 76, TRO[1] at 2.[2] Whaleco, owns and operates Temu, which through a mobile application and website, allows customers to purchase everyday products, including clothing and home goods, from third-party sellers at competitive prices. R. 79, Resp. at 3. PDD Holdings, on information and belief, operates and controls the services offered on the Temu mobile application and website (Temu Platforms). TRO at 2; *see also* R. 64, Second Amended Complaint (SAC) ¶ 3. PDD Holdings also owns and operates Pinduoduo, a similar e-commerce platform used for PDD Holdings's Chinese customers. TRO at 2; *see also* SAC ¶ 3. Temu and Shein are competitors in the e-commerce space. Resp. at 3.

On December 16, 2022, Roadget filed this case against Temu asserting, among others, claims of Lanham Act trademark infringement arising from Temu's alleged use of SHEIN Marks on Temu Platforms and on counterfeit Shein products. SAC ¶ 1. On February 3, 2023, Roadget filed a motion for preliminary injunctive relief (PI Motion) against Temu, seeking to enjoin Temu from using alleged unauthorized Twitter accounts bearing the SHEIN Mark and including SHEIN Marks in Temu advertisements on the Google search engine. Resp. at 3; *see also* R. 23, PI Motion ¶¶ 3–4. The Court entered a briefing schedule on the motion. R. 27.

While the PI Motion was still being briefed, Roadget sought leave to supplement its PI Motion, after finding additional evidence of Temu's alleged misuse of the SHEIN Mark. R. 53, Supp. PI Motion. The supplement identified the use of the

---

[1]Citations referring to "TRO" reflect Roadget's memorandum in support of the TRO, R. 76; and not the motion for TRO, R. 71.
[2]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

SHEIN Mark on the "Shein" results title page for the Temu website and as a watermark on images posted to the Temu website. *Id.* ¶ 4.

On March 1, 2023, Roadget filed a First Amended Complaint (FAC). R. 33. The FAC, among other things, added PDD Holdings and various unnamed Does as defendants. On June 9, 2023, Roadget sought leave to file the SAC (R. 61), which the Court granted on June 14, 2023 (R. 63), before the Court ruled on the PI Motion. The sprawling SAC, consisting of 17 counts, adds claims for contributory and vicarious trademark infringement (Counts III and IV), copyright infringement and inducement (Counts IX to XII), and trademark dilution under Illinois statute (Count XIV), and removes claims under the Illinois consumer fraud statute and brings its disparagement and trade libel claim under Massachusetts common law as opposed to Illinois statute (Count XVII). Yet still, Roadget has signaled to Temu and the Court that it plans to file a third amended complaint, R. 83, Reply at 3 ("Shein will be seeking leave to amend a third time.").

On July 7, 2023, Roadget filed this motion for TRO, alleging that Roadget had identified more evidence of Temu's misuse of the SHEIN Mark and failure to properly resolve, if resolve at all, instances of misuse of the SHEIN Mark by Temu's third-party sellers of which Roadget notified Temu. In particular, Roadget discovered the following violations of the SHEIN Mark on:

> (i) clothing designs (SAC ¶¶ 192–97); (ii) product labels used in images for listings that do not sell genuine SHEIN apparel (*id.* ¶¶ 136–40); (iii) webpage titles falsely advertising that "Shein", and affiliate-branded products can be purchased "On Temu" (*id.* ¶¶ 163–74); (iv) a counterfeit storefront called SHINE that uses an intentional misspelling and well-known phonetic mispronunciation of SHEIN and displays product images copied from Shein's

3

website (*id.* ¶¶ 215–20); and (v) in Temu-generated search term recommendations (*id.* ¶¶ 175–91). TRO at 1.

Roadget insists that it has notified Temu of thousands of instances of the misuse of the SHEIN Mark on Temu Platforms and requested the prompt removal of the misuses from the website. TRO at 1; *see* Resp. at 1. Temu claims that it has removed a majority of the infringing SHEIN Marks from Temu platforms, Resp. at 1, but Roadget counters that Temu has either "ignored, relisted, or unduly delayed acting on these notices." TRO at 1. Roadget cites the abovementioned newly discovered misuses of the SHEIN Mark as evidence of misuse.

Before the Court is Roadget's pending motion for TRO. Roadget is seeking a TRO on its Trademark Infringement, False Designation of Origin, and Copyright Infringement Claims only. Roadget maintains that it is entitled to injunctive relief because there is (1) a likelihood of success on the merits; (2) a threat of irreparable harm; (3) the threatened harm to Roadget outweighs that of the harm to Temu; and (4) the public interest requires such action. TRO at 4. Roadget submits the declarations of Roadget in-house counsel Tim Wei (R. 73, Decl. Wei), George Chiao, the president of Shein Distribution Corporation (R. 74, Decl. Chiao), and Nina Boyajian, counsel for Roadget (R. 75, Decl. Boyajian) in support of its motion.

The Court promptly set a briefing schedule, and hearing date for July 19, 2023, for the motion, R. 82, Minute Entry. However, due to the parties' unavailability the hearing was rescheduled to July 27, 2023. R. 84, Minute Entry. Temu filed a response opposing the TRO, supported by declarations from Zhu Ji, Temu's Director of trust

4

and safety, and Ryan Benyamin, counsel of record for Temu. Resp., Exhs. A–B. In its response, Temu argues that Roadget's TRO should be denied because Roadget is not likely to succeed on any claim that would warrant injunctive relief, the TRO is overbroad, and the harm is not irreparable. Resp. at 3. Roadget filed a reply. The Court heard oral argument on the TRO on July 27, 2023. R. 96, TRO Hrg.

## Legal Standard

A TRO is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *See Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The standard for obtaining a TRO is the same as that is required to issue a preliminary injunction. *See Merritte v. Kessel*, 561 Fed. Appx. 546, 548 (7th Cir. 2014). To obtain a TRO, a movant must demonstrate: (1) a likelihood of success on the merits; (2) that it has no adequate remedy at law; and (3) that it will suffer irreparable harm if the relief is not granted. *See Right Field Rooftops, LLC*, 80 F. Supp. 3d at 832 (citing *Smith v. Executive Dir. Of Ind. War. Mem'ls Comm'n*, 742 F. 3d 282, 286 (7th Cir. 2014)).

If the moving party satisfies each of these requirements, the court "must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction[.]" *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (quoting *Planned Parenthood, of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018)). "Specifically, the court weighs the irreparable harm that the moving party would endure without the

5

protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (citing *Abbott Labs. v Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992)).

The Seventh Circuit has described this balancing test as a "sliding scale": "if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win[,] the more that balance would need to weigh in its favor." *GEFT Outdoors*, 992 F.3d at 364 (citing *Planned Parenthood*, 896 F.3d at 816). Finally, in balancing the harms, the court must consider the interests of non-parties in granting or denying the requested relief. *Ty, Inc., v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

In resolving a motion for TRO, the Court reviews the record from a "neutral and objective viewpoint" without accepting Roadget's allegations as true, nor drawing reasonable inferences in Roadget's favor. *Doe v. University of Chicago*, 2022 WL 16744310, at *2 (N.D. Ill. Nov. 7, 2022) (citing *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022)). The Court must "make factual determinations on the basis of a fair interpretation of the evidence before the court" at this stage. *Darryl H. v. Coler*, 801 F.2d 893, 898 (7th Cir. 1986). However, the findings are only preliminary, and "do not bind the district court as the case progresses." *Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011).

## Analysis

The Court begins its analysis with whether Roadget has established the likelihood of success on the merits for its (1) Trademark Infringement and False Designation of Origin and (2) Copyright Infringement claims.[3]

To satisfy the likelihood of success requirement, a "possibility of success is not enough" and "neither is a better than negligible chance." *Illinois Republican Party v. Pritzker,* 973 F.3d 760, 762 (7th Cir. 2020) (cleaned up).[4] "But, the moving party need not show that it definitely will win the case." *Id.* at 763. A strong showing of likelihood of success on the merits thus normally includes "a demonstration of how the applicant proposes to prove the key elements of its case." *Id.*

### A. Likelihood of Success: Trademark Infringement

"The Lanham Act, the core federal trademark statute, defines a trademark by its primary function: identifying a product's source and distinguishing that source from others." *Jack Daniel's Properties, Inc., v. VIP Products LLC*, 143 S. Ct. 1578, 1579 (2023). "To help protect trademarks, the Lanham Act creates federal causes of action for trademark infringement[.]" *Id.* Section 43(a) of the Lanham Act provides for a civil action for infringement of a trademark. *See* 15 U.S.C. § 1125. To state a claim under Section 43(a), a plaintiff must allege that "(1) the mark is protectable,

---

[3]The Court considers together Roadget's claims related to Lanham Act trademark violations and false designation (Counts I–V, XIII) and separately those related to copyright violations under 17 U.S.C. § 101 *et seq.* (Counts IX–XI) since these claims share similar elements and would produce the same relief for Roadget.

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, Cleaning Up Quotations, 18 Journal of Appellate Practice and Process 143 (2017).

and (2) the defendant's use of the mark is likely to cause confusion among consumers." *Holbrook Mfg. LLC v. Rhyno Mfg. Inc.*, 497 F. Supp. 3d 319, 330 (N.D. Ill. 2020). Neither party disputes that SHEIN Marks are valid registered and protected trademarks. TRO at 8. No matter as Roadget has presented the U.S. trademarks registration for the SHEIN Marks as evidence that the SHEIN Marks are protectable. Decl. Wei, Exh. A. The issue is whether Temu's use of the SHEIN Marks is likely to cause confusion among consumers.

In assessing the likelihood of consumer confusion, courts consider: "(1) the similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the plaintiff's marks, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its goods as those of the plaintiff's." *Holbrook*, 497 F. Supp. 3d at 331. None of these factors is dispositive and the weight given to each factor is fact specific. *Id.* "There are a myriad of variables to be considered, but the most important are the similarity of the marks, the intent of the claimed infringer, and evidence of actual confusion." *Eli Lilly & Co. v. Nat. Answers, Inc.*, 86 F. Supp. 2d 834, 841 (S.D. Ind. 2000), *aff'd*, 233 F.3d 456 (7th Cir. 2000). The Court turns to each factor.

### 1. Similarity Between Marks

To determine whether the infringing SHEIN Marks and the authentic SHEIN Marks are similar, the Court looks to the marks as a whole; and "whether the customer would believe that the trademark owner sponsored, endorsed, or was

affiliated with the product." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 930 (7th Cir. 2008) (quoting *Nike, Inc. v. "Just Did It" Enters.*, 6 F.3d 1225, 1228–29 (7th Cir.1993)). Roadget argues that Temu displayed and used infringing SHEIN Marks that are identical to authentic SHEIN Marks to promote Shein goods taken from the Shein website. TRO at 8. Roadget presents at least two examples of SHEIN Marks on Temu Platforms, as well as the Wei Declaration, attesting to the SHEIN Marks as evidence of similarity between the marks. *See* Decl. Wei ¶ 21 ("Temu has marketed and offered for sale products that are similar to those offered on the SHEIN Website, including by using photos and product designs that are identical or strikingly similar to Roadget's copyrighted works"); *id*. at Exh. E. Temu does not deny that the infringing SHEIN Marks are similar to or the same as the authentic SHEIN Marks. When the infringing and authentic marks are the same or so similar to one another, as they are here, the likelihood of confusion is evident. *Microsoft Corp. v. Rechanik*, 249 F. App'x 476, 479 (7th Cir. 2007) ("The logos and labeling on Era Soft's counterfeit software closely resembled Microsoft's marks, so Era Soft's products were likely to confuse consumers."); *Coach, Inc. v. Treasure Box, Inc.,* 2013 WL 2402922 at *4 (N.D. Ind. May 31, 2013) (finding that infringing marks were so similar, and the products were in such high demand that customer confusion was clearly favored.). The infringing SHEIN Mark and the authentic SHEIN Mark are similar enough that a customer could believe that the infringing mark is associated with the authentic mark. As a result, this factor weighs in favor of Roadget.

    2.  Similarity of Products

9

"Whether the parties' products are the kind the public might very well attribute to a single source," is another question the Court must evaluate to determine likelihood of confusion. *AutoZone*, 543 F.3d at 931 (cleaned up). The parties do not need to be direct competitors or sell the same products and services; it is enough for customers to believe that the infringing product could be from the same party. *Id.* Roadget and Temu are direct competitors. Resp. at 3 (Temu states that it "competes against many e-commerce incumbents, including Shein."). Roadget submits evidence that identical or near identical infringing SHEIN Marks as well as the exact content and images from the Shein website appear on Temu Platforms, *see* TRO at 4–7. Because Roadget and Temu are competitors and the identical infringing SHEIN Marks appear on Temu Platforms, this factor weighs in favor of Roadget.

### 3. The Area and Manner of Concurrent Use of The Products

"The third factor in the likelihood of confusion analysis assesses whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 681 (7th Cir. 2001) (cleaned up). Temu and Shein are online platforms targeting the U.S. fashion and lifestyle market. *See* TRO at 8. Both platforms sell inexpensive clothing and home goods. *See* TRO at 8; *see also* Resp. at 3. Thus, this factor also favors Roadget.

### 4. The Degree of Care Likely to be Exercised by Consumers

The fourth factor examines the degree of care that a Shein customer would likely exercise when buying authentic Shein products. Courts traditionally abide by the rule that "[t]he more widely accessible and inexpensive the products and services,

10

the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *CAE, Inc.*, 267 F.3d at 683. Because both Shein and Temu offer inexpensive clothing and products, customers are more likely to exercise less care and discrimination in their purchases. Therefore, the likelihood of confusion is greater. This factor also weighs in favor of Roadget.

### 5. The Strength of the Plaintiff's Marks

For the next factor, the strength of the mark must be established. "The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular . . . source. The stronger the mark, the more likely it is that encroachment on it will produce confusion." *Coach, Inc*, 2013 WL 2402922, at *7 (cleaned up). Often courts consider quantifiable evidence to assess the strength of a mark. *Id*. (using length of use of the mark, volume of sales dollars, expenditures in promoting the mark, annual revenue from sales of goods bearing the mark, and the number of stores or retail outlets to determine the strength of a luxury brand). Roadget argues that the SHEIN Mark is very strong as demonstrated by the popularity of the Shein mobile application and its social media following. TRO at 8. Indeed, in his declaration, Chiao attests that Shein was the most downloaded shopping mobile application in the U.S. in 2021 and the most downloaded mobile application across any category in 2022. Decl. Chiao ¶ 7. Additionally, Chiao states that Shein has over 26 million followers on Instagram, 5.5 million on TikTok, and over 500,000 on Twitter. *Id*. Temu does not challenge the strength of the SHEIN Mark. No matter as this factor favors Roadget.

11

6. Any Evidence of Actual Confusion

Evidence of actual confusion is the sixth factor used in the likelihood of confusion analysis. Roadget concedes that there is no actual evidence of confusion, but insists that because discovery is ongoing, this could change, and the balance of factors still weighs in favor of Roadget. TRO at 11; *Coach, Inc.*, 2013 WL 2402922 at *7 ("Although evidence of actual confusion, if available, is entitled to substantial weight in the likelihood of confusion analysis . . . this evidence is not required to prove that a likelihood of confusion exists."); *see also Monster Energy Co. v. Jing*, 2015 WL 4081288, at *3 (S.D. Cal. July 27, 2018) (same). This factor favors Temu.

7. Intent to Palm Off Its Goods as Those of the Plaintiff's

The last factor is a defendant's intent to palm off its goods as those of the plaintiff. "In the infringement context, 'intent' refers to the intent to confuse customers, not merely the intent to use a mark that is already in use somewhere else." *Coach, Inc.*, 2013 WL 2402922, at *7 (cleaned up). Generally, "[t]he fact that one actively pursues an objective greatly increases the chances that the objective will be achieved[.]" *Eli Lilly & Co.*, 233 F.3d at 465.

Here, Roadget argues that infringing SHEIN Marks appear on counterfeit Shein products, particularly an image of a shirt with an infringing SHEIN Mark on the tag (but is delivered to the customer without said infringing SHEIN Mark) ("SHEIN Tagged Shirt") and a ROMWE jacket with an infringing SHEIN Mark listed in the description as a ROMWE product ("ROMWE Jacket"). TRO at 9–10. Roadget produced a Declaration from Boyajian and photos of the infringing clothing

evidencing the misuse of the SHEIN Marks. TRO at 5–6; Decl. Boyajian ¶¶ 28–35. Temu counters that the first sale doctrine shields Temu from liability. Resp. at 10. Regarding the SHEIN Tagged Shirt, Temu points out that "the product listings themselves do not claim to be Shein shirts, and the product shipped has no Shein mark at all," and that the image of the clothing is too small for customers to reasonably see the counterfeit SHEIN Marks on the tags. Resp. at 10–11. In terms of the ROMWE Jacket, Temu argues that the ROMWE Jacket has been removed from Temu Platforms. Resp. at 10.

The first sale doctrine, contrary to Temu's assertion, is not a defense to the presence of infringing SHEIN Marks on Temu Platforms. Resp. at 10. Under that doctrine, "once a trademark owner sells his product, the buyer may resell the product under the original mark without incurring any trademark liability." *Hart v. Amazon.com, Inc.*, 191 F. Supp. 3d 809, 818 (N.D. Ill. 2016), *aff'd on other grounds*, 845 F.3d 802 (7th Cir. 2017)(cleaned up). The caveat is that the resold goods must be authentic, trademarked goods. Temu says as much. Resp. at 10 ("A problem only arises when the product is not authentic, but counterfeit"). Temu does not point to any authentic SHEIN Marks on its website. Wei attests that Roadget has never authorized the use of SHEIN Marks on Temu Platforms. Decl. Wei ¶ 13 ("Roadget has never licensed or authorized the use of the SHEIN Marks or Affiliate Brand Marks to Defendants for any purpose whatsoever, or to any third party for any use in connection with the online retail store . . . and corresponding mobile application . . . or any product sold through the Temu Website."). In arguing that Temu takes down

13

infringing SHEIN Marks upon notice from Roadget, Temu admits to the presence of counterfeit SHEIN Marks on Temu Platforms. *See generally* Resp. at 7. Furthermore, Roadget provides evidence that the ROMWE Jacket was sold by an indirect subsidiary of Temu, Shanghai Yucan Information Technology. Decl. Boyajian ¶¶ 31–32. Specifically, after identifying the seller, Boyajian attests that "[a]s shown in an organizational chart on page 4 of Exhibit 4 . . . Shanghai Yucan Information Technology Co., Limited is one of PDD's indirect subsidiaries and is 100% owned by PDD 'through offshore holding entities.'" *Id*. Temu did not directly address this evidence. Thus, Temu knew or should have known that the ROMWE Jacket was counterfeit.

Temu's counterargument that "the product listing themselves do not claim to be Shein shirts, and the product shipped has no Shein mark at all," Resp. at 10, implies that the SHEIN Tagged Shirt is in fact counterfeit, as Temu admits the image of a shirt includes a SHEIN Mark on the tag. "Several courts have recognized that in counterfeit cases . . . the defendant has intentionally copied a trademark design with the intent to derive a benefit from the reputation of another." *Coach, Inc.*, 2013 WL 2402922, at *4 (cleaned up). The listing, therefore, does not need to claim to be authentic SHEIN Marks for customers to believe that the SHEIN Tagged Shirt is authentic. Just the image of clothing, regardless of the size, with the infringing SHEIN Marks and the product description are enough to suggest that the SHEIN Tagged Shirt is authentic; and thus, is confusing to customers.

Similarly, the ROMWE Jacket is both listed as a Shein product and bears the infringing SHEIN Mark, but is not authentic. This is the definition of counterfeit as Roadget points out. Reply at 9 ("The fact these sellers are not actually offering SHEIN-branded shirts means they are passing off goods as Shein's by using a counterfeit mark"). Since Temu has taken down the ROMWE Jacket, the risk of confusion is low. However, the SHEIN Tagged Shirt is an example of stylized SHEIN Marks on the Temu Platform that Temu is investigating. Resp. at 11. Therefore, the likelihood of confusion is high here.

Next, Roadget argues that the "continued display of counterfeit SHEIN Marks on [Temu] webpage titles advertising" Shein clothes implies that customers can buy Shein clothing on Temu and that the two are affiliated with one another. TRO at 10. Similarly, Roadget argues Temu has used the Google advertising platform to post infringing SHEIN Marks as the leading term for advertisements and their corresponding website link that when selected direct customers to the Temu website. R. 24, PI Motion at 6–7; R. 94, TRO Hrg. Tr. at 15:15–16:5. Temu responds that it has taken steps to remove the SHEIN Marks from the webpage titles, attributing any display of the counterfeit SHEIN Marks on the webpage to mere cache issues. Resp. at 9. As for Shein's affiliated brand "Luvlette," Temu claims that it was not aware that Shein owned the brand and Temu was only made aware of the issue as a result of the TRO. *Id*. Regarding the Google advertisements, Temu asserts that "competitors often bid on each other's words not to create confusion, but to give customers an alternative for when they search for one thing to see the other," and the issue is stale

because the advertisements have been taken down for several months. TRO Hrg. Tr. 26:3–27:5.

Roadget has provided evidence from the Boyajian declaration, Decl. Boyajian ¶¶ 58–63, that Temu has effectively placed the SHEIN Mark on Temu Platforms, and has concealed the Temu website behind the SHEIN Mark to misdirect and thereby confuse customers. PI Motion, Exh. E; *see Eli Lilly & Co.*, 233 F.3d at 465 (finding that "using another's trademark in one's metatags is much like posting a sign with another's trademark in front of one's store," and that it is evidence of the intent to confuse)(cleaned up).

Roadget contends that the "SHINE" storefront on Temu Platforms deliberately capitalizes off of a common mispronunciation of Shein by U.S. customers and uses a font stylized like the SHEIN Mark to attract Shein customers. TRO at 6, 9. The "SHINE" storefront, maintains Roadget, contains identical images found on the Shein website. *Id.* at 6, 9–10; *see also* Decl. Chiao ¶¶ 25–26 ("The images of women's dresses, blouses, shirts, t-shirts, tank tops, and camisoles depicted were sold under the SHEIN brand on the SHEIN website and mobile app."). Temu denies any involvement in "the naming of this seller, what the storefront sells, or what listings to include." Resp. at 11. Further, Temu complains that Roadget has not provided Temu with enough information about the alleged infringements to evaluate the allegation. Resp. at 11.

SHEIN and SHINE have similar fonts and colors, and SHINE may even be mispronounced to sounds like Shein. When considered that SHEIN is a well-known brand (*see supra* "Strength of Mark" analysis) and Temu has been in the clothing

16

business (through Temu's sister platform Pinduoduo) long enough to know Shein's reputation in the industry, Roadget has demonstrated that Temu intended to confuse customers. *See Autozone*, 543 F.3d at 934 (holding that defendants' familiarity with the automobile industry, AutoZone's extensive marketing, and similar designs between the two marks demonstrated that the defendant modeled his business to mislead customers into believing they were associated with AutoZone).

As additional evidence of trademark infringement, Roadget contends that the display of SHEIN Marks in the Temu search bar is confusing to customers because it recommends clothing with infringing SHEIN Marks and "counterfeit marks with terms for the types of products sold by SHEIN." TRO at 6. Putting aside Temu's first sale doctrine defense, Temu posits that customers typing in "Shein" into the Temu website search are "not likely to be confused, since they already know both Shein and Temu." Resp. at 12. Roadget replies that "[a] customer's awareness of both Shein and Temu as brands is irrelevant to whether there is a likelihood of consumer confusion," and cites several cases, both inside and outside of this Circuit, in support of its argument. Reply at 11. The Court agrees with Roadget.

The Seventh Circuit has specifically stated that customers who falsely believe that they are on one website because of an infringing mark are likely to poke around the website even after they have discovered that it does not contain products with the authentic mark; and this "poking around" misappropriates the goodwill of the trademark holder. *See Eli Lilly*, 233 F.3d at 465 ("The second fact probative of Natural Answers' wrongful intent is its references to PROZAC® in the source codes

17

of its Web site. The clear intent of this effort, whether or not it was successful, was to divert Internet users searching for information on PROZAC® to Natural Answers' Web site"); *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002), *as amended* (Oct. 18, 2002) ("Customers believing they are entering the first store rather than the second are still likely to mill around before they leave. The same theory is true for websites. Consumers who are directed to Equitrac's webpage are likely to learn more about Equitrac and its products before beginning a new search for Promatek and Copitrak."). Indeed, Temu is capitalizing off of the goodwill of Shein's customers. Roadget is likely to succeed in its trademark infringement claims.

## B. Likelihood of Success: Copyright Infringement

Next up is Roadget's likelihood of success on its copyright infringement counts. "To establish direct copyright infringement, a plaintiff must prove two elements: (1) ownership in the applicable copyright(s) and (2) unauthorized copying by the defendant of the constituent elements of the work that are original." *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 648 (N.D. Ill. 2002), *aff'd on other grounds*, 334 F.3d 643 (7th Cir. 2003). At the hearing, Temu disputed the authenticity of at least some of Roadget's copyright registrations but acknowledged that this issue was not before the Court. *See* TRO Hrg. Tr. at 19:6–21; 25:5–15. In the meantime, Roadget provides evidence that it owns valid copyright registrations for SHEIN Marks. *See* TRO at 11. The dispute turns on the second element.

As noted above, Roadget has presented evidence that Temu participates in the counterfeiting of Shein products, specifically a counterfeit jacket bearing the

ROMWE Mark sold on the Temu platform by one of PDD Holdings' indirect subsidiaries. Decl. Boyajian ¶¶ 31–32 (After identifying the seller, Boyajian attests that "[a]s shown in an organizational chart on page 4 of Exhibit 4 . . . Shanghai Yucan Information Technology Co., Limited is one of PDD's indirect subsidiaries and is 100% owned by PDD 'through offshore holding entities.'").

Aside from the ROMWE Jacket, Roadget argues "Temu is liable for the reproduction and public display of the infringing product images and designs on its website because it actively reviewed and selected the product images and listings prior to upload." TRO at 12 (citing *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 723 (9th Cir. 2019)); *see* Decl. Boyajian ¶ 12. As evidence[5] of Temu's active infringement, Roadget points to a complaint filed by Temu in the Northern of District California in which Temu describes itself as providing a wide array of services to its third-party sellers "including fulfillment, warehousing, logistics, customer services, post-sale support, returns, and refunds," in addition to "trust and safety services to curate sellers and control the quality of goods, risk control and data security services to protect consumers' personal and payment information." Decl. Boyajian, Exh. 10 ¶ 13. Roadget also submits a translated memorandum from Temu to its third-party sellers in which Temu states that it is not a normal e-commerce platform, because "Temu

---

[5]The Court recognizes that Roadget has submitted hearsay evidence that may not be admissible in other proceedings; however, the Seventh Circuit has found that courts may rely on such evidence at this juncture. *See SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991) ("Hearsay can be considered in entering a preliminary injunction.")(cleaned up); *FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 762 (N.D. Ill. 2016) ("Settled law . . . permits a district court to consider hearsay at the preliminary injunction stage.")(cleaned up). Temu did not object to the consideration of Roadget's hearsay evidence, and as such, has waived the point.

operates like a mode of end-to-end 'hosting': sellers only handle sourcing of goods, whereas the platform handles pricing, marketing, logistics and after-sales all inclusive." *Id*., Exh. 11 at 4. Temu then describes itself as a factory maker-seller (industrial zone merchant) that is the source itself of the third-party seller's goods. *Id*. Roadget also points to Temu's website, where Temu states that it creates and curates products from third-party sellers for the benefit of customers. Decl. Boyajian, Exh. 2. Last, Roadget cites a series of news articles about Temu, which describe Temu as a full-service marketplace that selects, approves, advertises, prices, stores, and distributes products from its third-party sellers. *See id*., Exhs. 7, 10–14.

Temu explains that it is merely a marketplace where third-party sellers offer products to consumers. Resp. at 5; *see* Decl. Ji. ¶ 2 ("Temu is a platform that allows for third-party sellers to offer their goods directly to consumers. . .; [t]hey upload information to these product listings, including the name of the seller, the name of the good being sold, the price, and various pictures of the product.). A platform operator, contends Temu, is not liable for third-party copyright infringement under 17 U.S.C. § 512(c), "if it expeditiously removes specific infringing content when notified by holders," Resp. at 5. A platform operator under the DMCA safe harbor provision, argues Temu, is also not liable for third-party copyright infringement if it did not intentionally induce or knowingly assist in the copyright infringement. Resp. at 5 (citing *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 778 (N.D. Ill. 2008)).

The Digital Millenium Copyright Act (DMCA) affords copyright holders protection from the illegal use or misuse of copyrighted material over the internet. 17

U.S.C. § 512(c). DMCA places the onus to police copyright infringement on the copyright holder as opposed to the person or platform hosting the copyrighted material. *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 603 (9th Cir. 2018). The DMCA's safe harbor provision, 17 U.S.C. § 512(c), provides as follows:

> (1) IN GENERAL.—A service provider shall not be liable for monetary relief ... for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—
> (A)
> > (i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
> > (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
> > (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
> (B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
> (C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

Other circuits have held that a DMCA safe harbor defense does not apply to "website owners . . . when they are *actively involved* in the infringement." *VHT, Inc*, 918 F.3d at 732. That is, "[t]here must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner." *Id*. (quoting *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004)). A website owner cannot be liable for infringing copyrighted material stored on its website or platform when the "infringing material is stored at the direction of the user if the service provider played no role in making that infringing material

21

accessible on its site or if the service provider carried out activities that were 'narrowly directed' towards enhancing the accessibility of the posts." *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1056 (9th Cir. 2017) (cleaned up). Narrowly directed activities include providing automatic processes and screening material for infringing acts and harmful material. *Id*; *see also Ventura Content, Ltd*, 885 F.3d 605 (finding Congress expressly provided platform operators that screen for illicit material as protected under section 512(m)). However, website owners are precluded from the DMCA safe harbor defense if they offer "extensive, manual, and substantive activities[.]" *Mavrix Photographs,* 873 F.3d at 1056.

The Court finds that Roadget has adduced evidence that Temu has used unauthorized copyright of the SHEIN Mark as a third-party seller and exercises more control than similar digital marketplaces over the third-party sellers and products sold on its platforms. As argued by Roadget and not rebutted by Temu, a counterfeit jacket bearing the ROMWE mark was sold on Temu Platforms by one of PDD Holding's indirect subsidiaries. Notably, Temu failed to address this assertion in its response brief. When questioned about the ROMWE Jacket, Temu denied the allegations, but provided no evidence in support. TRO Hrg. Tr. at 37:3–25. On the other hand, Roadget produced evidence from both Temu's own website and communications as well as articles detailing Temu's distinctive full-service model to defeat Temu's DCMA safe harbor arguments. Again, Temu failed to provide evidence rebutting Roadget's evidence. At this juncture and based on the evidence before the Court, Roadget has shown that Temu is actively involved in the copyright

infringement of SHEIN Marks. Based on the low bar, Roadget is likely to succeed on its copyright infringement claims and the Court need not address Counts X and XI.

The Court having found that Roadget has shown a likelihood of success on its Trademark Infringement and False Designation of Origin, and Copyright Infringement Claims, turns to the no adequate remedy at law and irreparable harm factors.

### C. No Adequate Remedy at Law and Irreparable Harm

A court's decision to grant a preliminary injunction is not dependent solely on the moving party's likelihood of success. The moving party must also demonstrate that there is no adequate remedy at law and without the court's intervention the moving party will suffer irreparable harm. Because these elements are related, the court analyzes them together. *Holbrook*, 497 F. Supp. 3d at 332. "Irreparable harm is harm that is not fully compensable or avoidable by the issuance of a final judgment . . . in the plaintiff's favor." *Id*. at 333–34 (cleaned up). In the context of trademark infringement, the "[c]ourts consider consumer confusion and the loss of goodwill to be irreparable because of the difficulty of quantifying the likely effect on a brand." *Id*. A remedy at law is inadequate if damages would be "seriously deficient as a remedy for the harm suffered." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Therefore, "injuries arising from Lanham Act violations are presumed irreparable, even if the plaintiff fails to demonstrate a business loss." *Promatek Indus., Ltd.*, 300 F.3d at 813.

Although the same presumption does not exist for successful copyright infringement claims, Roadget has demonstrated that "Temu is actively stealing the goodwill of the SHEIN Marks, diluting their source-identifying value and likely causing massive consumer confusion," which is both severe and unquantifiable. TRO at 13; *see Holbrook*, 497 F. Supp. 3d at 334 ("[T]he harm alleged by Plaintiffs is not fully compensable by money damages because . . . actual damages based on consumer confusion and the loss of consumer goodwill are difficult to quantify."). The presence of infringing SHEIN Marks on counterfeit Shein products, images of infringing SHEIN Marks on Temu Platforms, and infringing SHEIN Marks on the Temu search function and in Google advertisements would lead customers to believe that the SHEIN Marks on the Temu platforms are affiliated with Temu. Temu suggests that Roadget has "made no effort to empirically establish or quantify the extent of any harm or diversion." Resp. at 13. But in instances, like here, where the alleged infringing activity occurred on an online platform, courts have found that the harm is unquantifiable and not easily identifiable; therefore, courts rely on loss of market share when considering irreparable harm. *Antsy Labs, LLC v. Individuals, Corps., Ltd. Liab. Companies, Partnerships, & Unincorporated Associations Identified on Schedule A Hereto*, 2022 WL 17176498, at *3 (N.D. Ill. Nov. 23, 2022) ("While harm stemming from lost customers or contracts may be quantifiable if the lost customers or contracts are identifiable, the challenge of identifying lost business often transforms lost market share into irreparable harm")(cleaned up).

As for Temu's response to Roadget's request to take down the infringing Shein images, the Court finds that Temu has continued to allow infringing SHEIN Marks to appear on Temu Platforms and in Google advertisements despite Roadget's efforts to stop the harm at the heart of this litigation. Roadget has made Temu aware of the infringing SHEIN Marks be it through this litigation or DMCA Takedown Notices. *See* TRO at 4; *see also* Resp. at 1–2. Roadget has produced screenshots of infringing SHEIN Marks on Temu platforms, some that have been removed and some that have not. TRO at 5–6. In the same fashion, Roadget provides evidence (and Temu admits) that infringing SHEIN Marks in Google advertisements continue to appear, despite informing Roadget that the infringing SHEIN Marks had been removed. TRO Hrg. Tr. at 11:21–12:5; 26:3–27:5. The fact that Temu Platforms continue to have images of infringing SHEIN Marks satisfies Roadget's burden of showing a risk of irreparable harm. *See Antsy*, 2022 WL 17176498 at *3 ("But the fact that Defendants continue to list infringing products for sales satisfies Plaintiffs' burden of showing a risk of irreparable harm."); s*ee also Holbrook Mfg. LLC*, 497 F. Supp. 3d at 335 ("The repeat violations indicate that defendants' current policies and practices are insufficient to reduce the potential harm to plaintiffs before the final resolution of this case.")(cleaned up). As a result, Roadget has adequately established that it will suffer irreparable harm with no adequate remedy absent the Court's grant of the TRO.

### D. Balance of Harms and Public Interest

Last, the Court must determine whether the irreparable harm Roadget will suffer if the TRO is denied outweighs any harm Temu will suffer if the TRO is

granted. In balancing the harms, "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018). This balancing process, as the Seventh Circuit has explained, "also considers the public interest, or the effects the preliminary injunction—and its denial—would have on nonparties." *Speech First, Inc., v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). The Court evaluates this final element on Roadget's Lanham Act trademark and copyright infringement claims together.

Roadget maintains that Temu faces no hardship by refraining from engaging in trademark infringement and actively addressing infringement associated with the SHEIN Mark because Temu has a large marketplace that sells other goods besides clothing with the infringing SHEIN Mark. TRO at 15. Furthermore, Temu removes infringing products and images from Temu Platforms as a matter of business. So, this is not an additional burden. The Court agrees.

Temu is not harmed by refraining from conduct that constitutes trademark and copyright infringement. The harm to Roadget, on the other hand, as a result of denying an injunction outweighs the harm to Temu in granting it. And without an injunction, customers will continue to be confused about the relationship between Temu and the SHEIN Mark, thus affording Temu any customer goodwill that belongs to Roadget. *Holbrook*, 497 F. Supp. 3d at 335. Roadget has shown, at this juncture, that Roadget stands to lose the goodwill of its customers without injunctive relief.

26

It is true, as argued by Temu that it is Roadget's and not Temu's responsibility to police acts of infringement on Temu platforms. And nothing in this order shifts this responsibility onto Temu. But the evidence demonstrates that Roadget has shouldered this responsibility as it has according to Temu, sent over 10,000 Takedown Notices, and continues to send such notices to Temu. Resp. at 1; TRO Hrg. Tr. at 33:2–20. Roadget has provided evidence that Temu has either delayed the removal of infringing SHEIN Marks, allowed removed infringing material to be relisted, or not removed infringing material at all despite receiving a Takedown Notice from Roadget.

As for the public interest, this factor also weighs in favor of the injunction as there is a public interest in minimizing confusion between the SHEIN Mark and Temu. *Holbrook*, 497 F. Supp. 3d at 336 ("The public interest would similarly be served because the injunction prevents consumer confusion in the marketplace.").

In sum, at this juncture the Court concludes that Roadget has met all of the elements for the issuance of a temporary restraining order. Whether it can show it is entitled to a preliminary injunction is an issue for another day. *See*, *e.g.*, *U.S. Army Corps of Eng'rs*, 667 F.3d at 782.

## Conclusion

For the foregoing reasons, the Court grants Roadget's request for an emergency temporary restraining order as to its trademark and copyright infringement claims, R. 71. Although Temu did not insist on a bond for issue of the TRO, or a proposed amount of the bond, the Court orders Roadget to post bond. *Mead Johnson & Co.*, 209

F.3d at 1033 ("A bond is a condition to preliminary injunctive relief."). By August 3, 2023, at 6:00 p.m., Roadget shall deposit with the Court in the amount of $10,000, either cash or surety bond, as security. Provided that Roadget posts the bond by August 3, 2023, at 6:00 p.m., the TRO will become effective on August 3, 2023, at 6:00 p.m. This TRO will remain in effect until August 17, 2023, at 6:00 p.m. The Court requires briefing on the preliminary injunction. Roadget's brief in support of its request for preliminary injunction is due by August 7, 2023. Temu's Response is due by August 14, 2023, and Roadget's Reply is due by August 18, 2023. After reviewing the briefs and supporting evidence, the Court will determine whether a hearing is necessary, or whether it can simply rule on the briefs. If the Court determines a hearing is necessary, the Court will notify the parties by August 22, 2023.

Dated: July 31, 2023

United States District Judge
Franklin U. Valderrama