**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ROADGET BUSINESS PTE. LTD., | |
| *Plaintiff*, | Civil Action No. 1:22-cv-07119 |
| | Judge: Hon. Franklin U. Valderrama |
| v. | Magistrate Judge: Hon. Jeffrey Cummings |
| PDD HOLDINGS INC. and WHALECO, INC., | JURY TRIAL DEMANDED |
| *Defendants*. | |

<u>**DECLARATION OF NINA D. BOYAJIAN IN SUPPORT OF PLAINTIFF'S SECOND MOTION FOR A PRELIMINARY INJUNCTION**</u>

I, Nina D. Boyajian, declare as follows:

1.      I am an attorney licensed to practice law in the State of California. I am a Shareholder at Greenberg Traurig, LLP ("GT"), and I have been admitted on a *pro hac vice* basis to appear as counsel for Plaintiff Roadget Business Pte. Ltd. ("Shein" or "Plaintiff") before this Court in the Northern District of Illinois. I submit this Declaration in Support of Plaintiff's Second Motion for a Preliminary Injunction against Defendants PDD Holdings Inc. ("PDD") and WhaleCo, Inc. ("WhaleCo") (together, "Defendants") regarding infringing activity on the online retail store at https://www.temu.com and corresponding mobile application (together, the "Temu Website"). I have personal knowledge of the facts stated in this Declaration and if called to do so, would testify competently thereto.

<u>**PDD "owns and operates" the Temu Website, and works closely with its "suppliers" (i.e., "sellers") to select and "curate" products sold to consumers**</u>

2.      As reflected in its own public statements, PDD owned and operated the Temu Website when the alleged infringements of Shein's trademarks and copyrights in the United States

1

took place (beginning with its official launch in approximately September of 2022 to the present). On its website, PDD has publicly acknowledged that it owns and operates the Temu Website and its sister e-commerce platform, Pinduoduo. I directed various screenshots to be taken of PDD's investor webpage, https://www.pddholdings.com (the "PDD Page"), including versions of the webpage archived by the Wayback Machine (http://web.archive.org), which reflects how the PDD Page publicly appeared at a particular point in time in the past.[1] True and correct copies of these screenshots are attached as **Exhibit 1**, with relevant language highlighted. The archived copy of the PDD Page, as it appeared publicly on November 18, 2022 – and during the time of the alleged activities leading up to the filing of this lawsuit on December 16, 2022, shows that "PDD Holdings . . . owns and operates a portfolio of businesses, including Temu, an e-commerce marketplace for North American consumers, and Pinduoduo, a leading social commerce platform. It has built a network of sourcing, logistics, and fulfillment capabilities and shares these capabilities with its various businesses." The PDD Page also includes icons in orange and red for the Temu Website and its sister platform Pinduoduo.

3.      A true and correct printout of the Pinduoduo group's website, https://en.pinduoduo.com/group, as archived by the Wayback Machine on November 27, 2022, is attached hereto as **Exhibit 2**. On this website, PDD states that "PDD Holdings (Nasdaq: PDD) is a multinational commerce group that owns and operates a portfolio of businesses, including Temu, an e-commerce marketplace for North American consumers, and Pinduoduo, a leading social commerce platform. . . . PDD Holdings has built a network of sourcing, logistics, and fulfillment

---

[1] The Wayback Machine offers a standard custodian of records affidavit attesting to the authenticity of browser printouts of its archived pages. *See* https://archive.org/legal/affidavit.php. Courts also routinely take judicial notice of these archived pages. *See, e.g.*, *Hepp v. Ultra Green Energy Servs., LLC*, 2016 WL 1073070, at *2 (N.D. Ill. Mar. 18, 2016); *UL LLC v. Space Chariot Inc.*, 250 F. Supp. 3d 596, 604 n.2 (C.D. Cal. 2017); *see also* Fed. R. Evid. 801(d)(2)(A)-(E) (excluding party admissions from hearsay rule).

capabilities and shares these capabilities with its various businesses." PDD states that "Temu and Pinduoduo . . . both leverage on PDD Holdings' global network of sourcing, logistics, and fulfillment capabilities." PDD also states that Temu is a "member of PDD Holdings (Nasdaq: PDD)" that "works closely with [PDD Holdings's] global network of suppliers and logistics partners *to create and curate* quality products for consumers to enjoy the conveniences and comforts of life" (italics added).

4.      PDD's ownership and operation of the Temu Website is also reflected on the "About Temu" page of the Temu Website itself. I directed various screenshots to be taken of this page over time. Attached as **Exhibit 3** is a true and correct screenshot of the "About Temu" webpage, with relevant language highlighted, taken on March 27, 2023, stating "Temu . . . is an online marketplace  . . . . Temu was founded in Boston, Massachusetts in 2022 by its parent company PDD Holdings Inc. (Nasdaq:PDD), which also operates Pinduoduo in China." It also states that "Temu leverages parent company PDD Holdings' vast and deep network of merchants, logistic partners, and its established ecosystem" and touts access to PDD's "US$14.7 billion revenue, US$2.2 billion net income and US$4.6 billion net cash generated from operating activities in 2021" and "[h]andling [of] 61 billion orders from 11+ million *suppliers* in 2021" (italics added). It notes that "Temu and Pinduoduo are sister companies that both leverage on PDD Holdings' global network of sourcing, logistics, and fulfillment capabilities."

5.      Thus, the PDD and Temu websites confirm that PDD owns and operates the Temu Website, and that PDD runs the Temu Website similar to its sister ecommerce site, Pinduoduo, which are both described as utilizing the same global network of merchants and suppliers.

**Many Temu "sellers" came to Temu from Pinduoduo, a notorious counterfeit site blacklisted by the United States Government**

6.      Based on the statements posted on the PDD and Temu Website, and on news

articles and other publicly available material detailing Temu's operations, the Temu Website appears to be a rebranding of the Pinduoduo platform, which has been blacklisted by United States regulators. A true and correct copy of excerpts of PDD's Form 20-F Annual Report dated April 26, 2023 is attached as **Exhibit 4** ("Form 20-F"), and a true and copy of excerpts of a report published by the United States Trade Representative, *2022 Review of Notorious Markets for Counterfeiting and Piracy*, https://ustr.gov/sites/default/files/2023-01/2022%20Notorious%20Markets%20List%20(final).pdf. (last accessed May 23, 2023), is attached as **Exhibit 5** ("2022 USTR Report"). As shown on page 17 of the Form 20-F, Pinduoduo has been designated a "notorious market" by the USTR since 2019. PDD also states on page 47 of the Form 20-F that "[y]ou may experience difficulties in effecting service of legal process, enforcing foreign judgments or bringing actions in China against us or our management named in the annual report based on foreign laws. . . . We conduct a significant portion of our operations in China and a significant portion of our assets are located in China. . . . [T]here is uncertainty as to whether the courts of the Cayman Islands or the PRC would recognize or enforce judgments of U.S. courts against us . . . . China does not have any treaties or other forms of written arrangement with the United States that provide for the reciprocal recognition and enforcement of foreign judgments. . . .[I]t is uncertain whether and on what basis a PRC court would enforce a judgment rendered by a court in the United States."

7.     As shown on page 31 of the 2022 USTR Report the United States Trade Representative notes Pinduoduo's "unresponsiveness" and "ineffectiveness" in addressing the "large volumes of counterfeit goods that remain on the platform[,]" which has become "exacerbated" due to "delays in takedowns, lack of transparency with penalty mechanisms and decisions rejecting takedown requests," "burdensome and expensive processes, ineffective seller

vetting, diverging tools for the web platform and the app, and reduced engagement with some right holders." "Right holders also report difficulties in receiving information and support from Pinduoduo in pursuing follow-on investigations to uncover the manufacturing and distribution channels of the counterfeit goods."

8.    Despite having been blacklisted by the U.S. government, Pinduoduo sellers continue to sell products to U.S. consumers through Temu, as reported in various articles. Attached as **Exhibit 6** is a true and correct certified translation of an article by Wang Yu, *"The Ultimate Sale" is coming! Pinduoduo's Temu shakes up the cross-border e-commerce industry*, EBRUN (Mar. 22, 2023), available at https://www.ebrun.com/20230322/514247.shtml (last visited July 4, 2023). This article, referring to the platform as "Pinduoduo's Temu," reported in March of 2023 that in China, "factory-type sellers" from "various industrial belts" were "recruited" for the Temu Website. It further described the Temu Website as the "2022 Pinduoduo Overseas Support Plan" and the "Pinduoduo's overseas e-commerce platform" that "Pinduoduo launched." *See* Ex. 6 at 8.

9.    Attached as **Exhibit 7** is a true and correct certified translation of the article *Application process for joining Temu, Pinduoduo's cross-border platform*, ZHIHU.COM (Aug. 31, 2022), available at https://zhuanlan.zhihu.com/p/559443616 (last visited July 7, 2023). Published the day before Temu's official U.S. launch on September 1, 2022, the article refers to the Temu Website as "Pinduoduo's B2C cross-border e-commerce platform Temu" and relays the process for becoming a seller on Temu. Screenshots of the application process, copied below from the article, show the application portal described as the "Pinduoduo | Cross-border Seller Center":



10. According to certain news outlets, many sellers on the Temu Website appear to be the same sellers on the Pinduoduo platform that are obscured behind anonymous seller names. Attached as **Exhibit 8** is a true and correct printout of the article by Peter Aitken, *AI program flags Chinese products allegedly linked to Uyghur forced labor: 'Not coincidence, it's a strategy'*, FOXNEWS.COM (June 16, 2023), available at https://www.foxnews.com/world/ai-program-flags-chinese-products-allegedly-linked-uyghur-forced-labor-not-coincidence-strategy (last visited June 29, 2023). The article states that a third-party firm analyzed shipping data to determine that "products on Temu would lead to non-indicative names and untraceable company information. But when compared to the same product on sister platform Pinduoduo in China, the company was able to see the products came from companies in Xinjiang, just eight miles away from known Ughyur [sic] detention centers . . . ."

11. According to another independent third-party source, verified Pinduoduo platform sellers are automatically qualified to sell on Temu. Attached as **Exhibit 9** is a true and correct printout of the article by Erica Livingston, *How To Sell On Temu? – Complete Merchant Guide 2023*, TALKLEISURE.COM (May 1, 2023), available at https://talkleisure.com/how-to-sell-on-temu/

(last visited June 29, 2023). The article states that "becoming a verified seller on Temu's parent company is one path to becoming a trusted merchant on the platform" and that "[f]or those who are already verified sellers on Pinduoduo . . . [a]ll you need to do is log in to your Pinduoduo account, click on the 'Seller Center' tab, select 'Temu' from the drop-down menu, and follow the prompts to link your account to Temu."

**Defendants Control Material Aspects of the Temu Website by Closely Managing the Supply Chain and Product Listings of Purported "Sellers," where Defendants are Actively Involved in the Selection of Products, Review of Listings, and Pricing and Distribution of Products Sold on the Temu Website**

12.     As reflected in direct statements by WhaleCo and in third-party news articles describing the experiences of purported "sellers" on the Temu Website, Defendants directly and/or indirectly control nearly every aspect of the purported sellers' product selection, product listing displays, pricing, advertising, and distribution – demonstrating that Defendants do much more than merely facilitate third-party sales transactions on the Temu Website.

13.     First, Defendants curate and select which sellers and products are sold on the Temu Website *before* any product is listed. Attached as **Exhibit 10** is a true and correct copy of a complaint filed by WhaleCo in *Whaleco Inc. v. Temuds.com*, 3:23-cv-00367, ECF No. 1 (N.D. Cal. Jan. 25, 2023). In paragraph 13 of the *Temuds.com* complaint, WhaleCo admits that it "and its affiliates" provide a "wide range" of services to sellers, "including fulfillment, warehousing, logistics, customer services, post-sale support, returns and refunds," as well as "trust and safety services to *curate sellers and control the quality of goods* . . ." (italics added). In paragraph 33, Whaleco further states that it undertook "substantial efforts" to "select[], recruit[], and screen[]" sellers on the Temu Website. As shown in **Exhibit 2** above, PDD has also stated that Temu "works closely with [PDD Holdings's] global network of suppliers and logistics partners *to create and curate* quality products for consumers to enjoy the conveniences and comforts of life" (italics

7

added).

14.     Defendants' affirmative assertions regarding their close review, selection, and screening of sellers and products before they are listed on the Temu Website are echoed throughout various articles. For instance, it was reported that Defendants actively recruited "factory sellers" (not individual sellers) in China, described as "suppliers" that "only need to prepare goods and arrive at the warehouse," and are effectively "a hands-off shopkeeper," where "Temu is responsible for product pricing, marketing and customer acquisition, and contract fulfillment" and implements a "strict screening mechanism" for the goods sold on the Temu Website. These observations are set forth in **Exhibit 11**, which is a true and correct copy of a certified translation of the article *Pinduoduo Temu price war escalates, small and medium sellers can hardly hold on*, ZAKER (June 13, 2023), available at https://app.myzaker.com/article/6487c8161bc8e0fa2b000011 (last visited June 30, 2023). The article further states that "[s]ince March this year, the dedicated team of Pinduoduo's overseas support plan has gone deep into 100 high-quality industrial belts in Guangdong, Fujian, Zhejiang, Jiangsu, Shandong, Hebei, Anhui, Shaanxi, Sichuan, Hubei, etc. recruiting factory-type sellers to enrich Temu's Lineup of sellers. . . . Pinduoduo will invest tens of billions of resources to build 100 overseas brands in the first phase, support 10,000 manufacturing companies to directly connect to overseas markets, and help China's manufacturing industry to upgrade to overseas markets." The article states that these "factory sellers (industry belt merchants)" are not like "individual sellers," who are "just a middleman." These "factory sellers" are the "'source' themselves, without middlemen[,]" and "Temu has become their stable shipping channel."

15.     In the months after the Temu Website's official launch, a Chinese news article reported in detail PDD's pre-upload screening process for the selection of products that could be

sold on the Temu Website and PDD's warehousing of goods, as well as its post-upload handling of sales and direct-to-consumer deliveries. Attached as **Exhibit 12** is a true and correct certified translation of *Pinduoduo Emulating Amazon's Model! Is Temu really a trend? Sellers who have joined the platform have something to say!*, SINA.COM (Sept. 15, 2022), available at k.sina.com/cn/article_6469010462_18195441e0010185sn.html (last visited June 29, 2023). Published just 15 days after Temu's launch, the article states that to become a seller on Temu, "[a]s per Pinduoduo Cross-border Investment's policy and insider information, domestic sellers [were] only required to submit appropriate products and report the minimum price based on the recruitment category . . . ." Then, "[o]nce **Temu's buyers and pricing team approve[d] the selection**, the seller [would] send the products to the Guangzhou domestic warehouse for stocking. **Temu** [would] then **take care of the product listing**, order placement, and shipping." The article outlined these processes in a flow-chart, copied below, which was reportedly obtained from "Pinduoduo cross-border." The chart states, according to the certified translation, that "[n]o operational skills [were] required" for the seller, and "**Pinduoduo** will take care of the entire process." The initial "[b]usiness startup process" entailed a seller "provid[ing] the store name and store ID to the buyer" (here, referring to a Pinduoduo-affiliated buyer, not the consumer) which then "reviews [the] store" and "reviews [the] products/inventory" before the seller delivers the products to PDD's warehouses to be stocked prior to product launch. Next, during the "[p]roduct launch and sales process", the "**[b]uyer**" (again, referring to a PDD-affiliated buyer) **"selects products"** for listing, after which the "[s]eller sends sample[s]" of those products to PDD, whose "pricing team" determines the price at which the product was listed, as shown here:



16.     The article attached as **Exhibit 12** further states that "[a]ccording to reports, [the] Temu Platform reserve[d] the right to **reject products submitted by sellers**" (emphasis added). One such reason why "uploaded products" might not be selected, according to the sellers interviewed for the article, was that the product was a "non-bestselling product[]"; another was for "[i]nformation presentation-related reasons: title, main image, attribute issues . . . ."

**2. There are three main reasons why uploaded products may not be selected:**

1) <mark>Product-related reasons</mark>: non-bestselling products, incorrect inventory, etc., not uploaded according to the [2. Uploading Products-2 Product Upload Rules] prompts
2) <mark>Information presentation-related reasons</mark>: title, main image, attribute issues, not uploaded according to the prompts of [2. Uploading Products-Notes 1, 2, 3]
3) <mark>Supply price-related reasons</mark>: the supply price is higher than that of peers

Note 1: Once the aforementioned issues have been addressed, kindly reach out to the customer service representative handling the relevant category and restart the product selection process.

17.     In other words, **Exhibit 10** describes a rigorous screening process for prospective Temu sellers and products that involved a review and approval process by PDD-affiliated "buyers" before sales are launched and listed on the site.

18.     **Exhibit 7**, another article by an independent third-party source, explains that at least at around the time of Temu's launch, the seller was required to upload images of "[p]lanned sales products" to the Pinduoduo Cross-border Seller Center page, as shown in the below screenshot, then "[s]ubmit and wait for review." *See* Ex. 7 at 6. According to the article, it would "take about 3 days for the review to be approved."





19.     Just as Temu controls the pre-sale selection and review of products and product photos, other articles report that Temu directly influences and determines pricing strategy. Attached as **Exhibit 13** is a true and correct certified translation of the article *Pinduoduo Temu Lowest Price Model Policy*, Sohu.com (June 20, 2023), available at https://www.sohu.com/a/687589767_121483115#google_vignette (last visited June 30, 2023). The article explains Defendants' close management of the inventory and pricing of products sold on the Temu Website, where the platform (as opposed to the seller) decides when to take products "off the shelves" and has "the say-so to make final decisions regarding the return of goods in stock". Page 3 of the article states that as of June 20, 2023, Temu had recently implemented a policy of issuing refunds without requiring consumers to return the products. The article further provides that Temu employs a price "bidding" process in which Temu's "objective was to secure the same product at a lower price," and when a seller's bid "fails to win, they are restricted from restocking or introducing new products."

20.     Similar observations were made in other articles noting Temu's determination of pricing and post-upload product offerings of sellers. *See* **Ex. 11** at 4 (stating that Temu, not the seller, will "reduce the profit" for items based on "the market situation," and noting the difference between "all-inclusive" Temu and "general e-commerce platforms, [where] at what price an item is sold for is decided by the seller, who finds their own sources of goods and arranges their own shipping and delivery"); *see also* **Ex. 12** at 10 (reporting that sellers complained that they "ha[d] no pricing power" and "simply suppl[ied] goods to the Temu Platform, and the pricing control [lay] with the platform" which "continuously screen[ed] sellers[.]").

21.     PDD also handles customer service for the sellers' products through the Temu Website. *See* **Exs. 10** (statement by WhaleCo that WhaleCo offers customer service and refunds for the Temu Website), **13** (noting that Temu has implemented a policy of issuing refunds without requiring consumers to return the products).

22.     Attached as **Exhibit 14** is a true and correct copy of an article by Anna Zhadan, *Temu downloads jump 57% despite US-China tensions*, CHARGED (Apr. 11, 2023), available at https://www.chargedretail.co.uk/2023/04/11/temu-downloads-jump-57-despite-us-china-tensions/ (last visited June 29, 2023). The article states that in the first three months of 2023, downloads of  "[o]nline shopping platform Temu . . . r[ose] 57% amid economic uncertainty and growing US-China tensions."

23.     Defendants have asserted that they respond "quickly" to notices of infringement. Attached as **Exhibit 15** is a true and correct copy of the Temu Website Intellectual Property Policy, available at https://www.temu.com/intellectual-property-policy.html?refer_page_name=home&refer_page_id=10005_1688249395398_5xqe12o3ol&refe r_page_sn=10005&_x_sessn_id=xb2188algs, with relevant language highlighted. The policy states that Defendants "have a strict policy against the listing or sale of products that violates [sic] a third-party's trademark, copyright or patent rights. We strive to respond quickly by removing or disabling access to the allegedly infringing material when we receive a report of intellectual property infringement that complies with this intellectual property policy." The policy also states that "[w]e terminate repeated intellectual property infringers' access to our services in appropriate circumstances and at our discretion. These actions apply to any accounts we believe are associated with or operated by the repeated infringer."

24.     In the course of this lawsuit, Defendants have demonstrated the ability to take down infringing product listings within the same day of receiving notice. Attached as **Exhibit 16** is a true and correct copy of correspondence between the parties' respective outside counsel on April 19, 2023, showing that at 11:48 a.m. Pacific Standard Time, a GT lawyer at my direction notified outside counsel for Defendants of a photograph bearing a counterfeit SHEIN watermark on the Temu Website (and informing defense counsel of Shein's intent to file a motion later that day to supplement its original motion for preliminary injunction with this – and other – new

14

evidence of infringement ("Motion to Supplement")):



25.      In paragraph 6 of the Declaration of Zhu Ji filed in this matter (Dkt. 59-3) in

support of WhaleCo's response in opposition to the Motion to Supplement (attached as **Exhibit**

**17**), Temu claimed to have removed the listing on "the same day it received notice that Shein

was going to file a motion to supplement its request for a preliminary injunction."

26.      Notwithstanding the representations in the Temu Intellectual Property Policy and

Defendants' ability to quickly take down a product listing, Temu failed to expeditiously remove

or disable access to certain infringing listings identified in a DMCA notice sent by Shein. As

detailed in the accompanying Declaration of Tim Wei, in one example, Temu's IP Protection

Team took nearly six weeks to respond incorrectly that it had taken down the infringing content

identified in Shein's DMCA Notices.

## Temu's Sale of Counterfeit ROMWE Jackets

27.     Throughout the course of this lawsuit, I have directed employees of GT to investigate ongoing and unauthorized use of the SHEIN marks on the Temu Website, which is discussed throughout this declaration.

28.     In carrying out this investigation at my direction, on May 26, 2023, a GT employee entered the term "Romwe", a mark owned by Plaintiff, into the search bar on the Temu Website. Attached as **Exhibit 18** is a true and correct screen capture of the resulting search results webpage, titled "Romwe – Free Returns Within 90 Days – Temu". As shown in the exhibit, the first product listing displayed in the search result depicts a white jacket bearing a "Romwe Limited" design, as shown below:



29.     Attached as **Exhibit 19** is a true and correct screen capture of the actual product listing for this jacket (the "Counterfeit ROMWE Jacket"). The product title and description shown on the listing was "Men's Plus Size Jacket, Spring Casual Streetwear With 'Romwe Limited' Print, Oversized Clothing." The listing offered the jacket in four different "colorways" (white, black, green, and blue variations on the same design).





30.     Attached as **Exhibit 20** are true and correct photos taken on June 9, 2023 of a blue colorway Counterfeit ROMWE Jacket I purchased on May 29, 2023 through this product listing, along with the orange Temu-branded packaging in which it arrived. As shown in **Exhibit 21**, a true and correct photo of the reverse side of the same packaging, with personal identifying information redacted, the shipping label indicates that the product was sent to the United States from:

Shanghai Yucan
CAN03
North side of Chuangxin street, Sihui City
526200 Zhaoqing
CHINA, PEOPLES REPUBLIC

31.     As shown in an organizational chart on page 4 of **Exhibit 4** above (PDD's Form 20-F), Shanghai Yucan Information Technology Co., Limited is one of Defendant PDD's indirect subsidiaries and is 100% owned by Defendant PDD "through offshore holding entities."

32.     Even while the Counterfeit ROMWE Jacket was no longer available for purchase at some point thereafter, the Temu Website continued to publicly display the listing for the Counterfeit Romwe Jacket and product images containing the counterfeit ROMWE mark. Attached as **Exhibit 22** is a true and correct screenshot of the listing on June 13, 2023.

33.     As of July 7, 2023, the listing for this product continued to appear in Google search results for "romwe limited jacket," as shown in the below screenshot:



34.     A true and correct copy of this screenshot, as well as a capture of the search results webpage, is attached as **Exhibit 23**. These screenshots were taken at my direction on July 7, 2023 by an employee of GT using the Google Chrome browser's Incognito mode.

### Temu's Display of Listings Containing Images Bearing the Stylized SHEIN Mark on Product Tags

35.     As shown in Exhibit B to the accompanying Wei Declaration, the Temu Website displayed and marketed product listings using images bearing stylized SHEIN Marks on the clothing's product tags. Below is an example of one such product image:



36.     I directed purchases of some of the products sold under these Temu Website listings. Attached as **Exhibit 24** are true and correct photos of those purchased products taken on May 30, 2023. As can be seen in the exhibit, the purchased products themselves do not bear the

19

stylized SHEIN Mark on the product tags, unlike the images advertising the products.

37.     Two of the products purchased bear tags containing QR codes that, when scanned by the purchaser's mobile phone, direct the user to Shein's website. Attached as **Exhibit 25** are true and correct photographs of these tags and photographs showing the QR code redirection.

38.      Thus, Defendants displayed and promoted products using images bearing counterfeit stylized SHEIN Marks on the product tags. As explained in the accompanying Declaration of Tim Wei, the actual underlying products are not affiliated with the SHEIN brand, and the Temu Website has never been authorized to sell or promote products using images that display stylized SHEIN product tags.

39.     Several of the Temu product images depicting the stylized SHEIN Mark in product tags, as well as the URLs of the associated product listings on the Temu Website, were identified on May 24, 2023 in my Reply Declaration in support of Roadget's Motion to Supplement (Dkt. 60-1 ¶ 17). Thus, Defendants were aware of these infringing listings as of at least that date. A true and correct screenshot of one such image and listing on the Temu Website for the product "Casual Short Sleeve Crew Neck Skull T-shirt" is reproduced below:



40. Despite Defendants' knowledge of these infringing uses of the SHEIN Mark, the above listing (for the "Casual Short Sleeve Crew Neck Skull T-shirt") using the same photo displaying the SHEIN Mark remained active on the Temu Website over a month after it was identified in my Reply Declaration (and for at least two weeks after it was identified again in the Second Amended Complaint), where consumers could continue to purchase the product, believing (based on the image) that this was genuine SHEIN-branded apparel. This is shown in screen captures of this listing, taken by an employee of GT on June 22, 2023 and June 28, 2023. True and correct copies of those screen captures are attached as **Exhibit 26**. As shown in the exhibit, the full listing, including the infringing image, was still displayed as of June 28, 2023, and the underlying Skull T-shirt was still purchasable on June 22, 2023 (as evidenced by the orange "Add to cart" button).

**Counterfeit SHINE Storefront on Temu**

41.    On or around June 6, 2023, I visited a seller page on the Temu Website offering women's clothing under the name "S H I N E" (the "Counterfeit SHINE Store") at https://www.temu.com/s-h-i-n-e-m-5179453462352.html. Various true and correct screenshots of the page and the images listed on its "Home" page, along with the "hover card" created using content derived from the webpage's title when a user hovers with their mouse over the webpage tab, are reproduced below and attached as **Exhibit 27**.



(*Screenshot of the SHINE storefront on the Temu Website*)



*(Screenshot of the hover card displaying the webpage title for the SHINE storefront homepage)*



*(The infringing SHINE mark displayed in a banner on the SHINE storefront homepage)*



*(Images of products offered on the SHINE storefront displayed on the SHINE storefront homepage )*

23

42.     The Counterfeit SHINE Store displayed the counterfeit and infringing word "S H I N E" in the webpage title ("S H I N E | Buy More, Save More | Temu"), the word "SHINE" in capital letters in the banner display in rainbow colors, and the name "SHINE" as the seller name atop the initial landing page. Below the counterfeit SHEIN Marks, the Temu webpage for this seller storefront displayed scores of images and product listings for women's dresses, blouses, shirts, t-shirts, tank tops, and camisoles.

43.     As stated in the accompanying Declaration of George Chiao, "Shine" is a common mispronunciation of "SHEIN" among United States consumers. As shown in WhaleCo's response to Interrogatory No. 21, attached as **Exhibit H** to the Wei Declaration, another seller on the Temu Website who has sold products using infringing product photos is named "More shine kid".

44.     A collection of true and correct screenshots of the Counterfeit SHINE Store taken on June 9 and June 17, 2023, including the "Home" and "Items" tabs, as well as listings on the "Items" tab sorted by "top sales", is attached hereto as **Exhibit 28**.

45.     As shown in **Exhibit 28** and reproduced below, and as shown in Exhibit V to the accompanying Declaration of George Chiao, nine of the Counterfeit SHINE Store's top 10 selling products were products offered on the SHEIN website and mobile app, and those products were sold through listings using 9 product images virtually identical to the listings of products offered on the SHEIN website and mobile app:



46.     Attached hereto as **Exhibit 29** and shown below is a chart created by a GT employee at my direction, containing true and correct screenshots of product listings offered through the Counterfeit SHINE Store against listings (identified in the Exhibit V to the Chiao Declaration) for identical products offered on the SHEIN website and mobile app. Examples of these listings are reproduced below:

| Images of Genuine SHEIN-Branded and Affiliate Branded Products | Images and Product Listings Offered through Counterfeit SHINE Store Page |
|---|---|





| Images of Genuine SHEIN-Branded and Affiliate Branded Products | Images and Product Listings Offered through Counterfeit SHINE Store Page |
|---|---|





47.     Images on the Counterfeit SHINE Store's product listings showed what appear to be crude modifications of product images from the SHEIN website and mobile app, including by cropping out the model's face, erasing props and limbs, and replacing the background of each image with the same gray, concrete wall:



| Images of Genuine SHEIN-Branded and Affiliate Branded Products | Images displayed on Counterfeit SHINE Store Page |
|---|---|



**Temu's Continued Display of SHEIN Marks in Webpage Titles that Falsely Convey an Affiliation with and/or Endorsement by Shein**

48.     On April 16, 2023, I visited the website www.temu.com and input the search term "shein" into the search bar at the top of the webpage while using both the Google Chrome and Microsoft Edge browsers. Attached as page 1 of **Exhibit 30** is a true and correct copy of a screenshot captured at my direction reflecting how the resulting page (the "Infringing Page") appeared in the Microsoft Edge browser when I hovered over the page tab with my mouse, and is reproduced below. As shown on this screenshot, the title of the webpage, "Shein – Buy Shein Plus Size Dresses, Shein Clothing And Shein Bathing Suits Online With Free Shipping On Temu", appeared in full when hovering over the page tab with the mouse. (Defendants refer to

this display as a "hover card" in Defendants' briefing.) On the webpage below the page title, the

Temu site displayed "1000+ results for 'shein'" and below that, at least 20 pages of product

listings, including of women's and men's apparel, makeup, accessories, home décor, and other

products. Substantially the same display resulted when entering the same search term on the

Temu website using the Google Chrome and Apple Safari browsers.





49.    At my direction, on April 19, 2023, a GT employee ran the same search on

www.temu.com, and captured the resulting webpage upon entering "shein" into the search bar, at

https://www.temu.com/search_result.html?search_key=shein&search_method=user&refer_page

_el_sn=200010&refer_page_name=home&refer_page_id=10005_1681921039875_vylt3z5l5e&r

efer_page_sn=10005&_x_sessn_id=to7w6uf11v. A true and correct excerpt of the captured webpage (performed using the Page Vault software which provides relevant metadata) is attached hereto as the remainder of **Exhibit 30**.

50.     In support of its opposition to Shein's motion to supplement evidence in support of its preliminary injunction motion ("Motion to Supplement"), Temu represented under oath that it had "discontinued its use of" the above webpage title using the counterfeit SHEIN marks to advertise "Shein – Buy Shein Plus Size Dresses, Shein Clothing And Shein Bathing Suits Online With Free Shipping On Temu." Attached as **Exhibit 31** is a true and correct copy of the Declaration of Yao Wu, where in paragraph 9 he states, "On April 25, 2023, Temu discontinued its use of the following preset title: '{query} – Buy {sim_query} Online With Free Shipping on Temu.' This will prevent the complained-of hover card from appearing when a user searches for 'shein' on Temu."

51.     While it appeared (based on GT's review of the website) that Temu did disable this preset title feature shortly after Roadget filed its Motion to Supplement and through April 24, 2023, the date Roadget filed its reply brief (Dkt. 60), Temu subsequently *re-enabled* this preset title function. Attached hereto as **Exhibit 32** are true and correct copies of a screen capture on June 20, 2023 on the Google Chrome and Microsoft Edge browsers of the same webpage and depicting the very same hover card, showing continued use of counterfeit SHEIN marks in the Temu webpage title "Shein – Buy Shein Plus Size Dresses, Shein Clothing And Shein Bathing Suits Online With Free Shipping On Temu."

52.     Further, Temu's assertions set forth in the Declaration of Yao Wu contending that this and similar search result webpage titles were simply auto-populated by terms queried by the user (suggesting that the counterfeit marks were generated by users and by Shein conducting

searches of itself, and not by Temu), is refuted by additional screen captures of the Temu website taken at my direction on April 27, May 1, and May 10, 2023, attached as **Exhibit 33**. For example, after Roadget notified Temu of the above webpage title, the Temu Website displayed other page titles such as "**Sheiin** – Free Returns Within 90 Days – Temu," "**Sheain** – Get Great Deals on Temu," and "**Shein Cy** Starting From $0.49" (emphasis added). These page titles displayed misspellings of the word "Shein" or included additional words next to the word "Shein," even when "shein" was not misspelled when entered in the search bar by the user, and the word "shein" was not entered with any additional text in the search bar.



*(Screenshot taken on April 27, 2023, using search term "shein")*



*(Screenshot taken on May 1, 2023, using search term "shein")*



*(Screenshot taken on May 10, 2023, using search term "shein")*

53.     If the Temu website were merely parroting back the user's search term in the webpage title, the webpage title should have repeated the correct spelling of Shein. The exhibits attached show it did not. Further, during the week of April 16, 2023, I performed and/or directed searches of over two dozen non-Shein search terms, including other generic product names and brand names. A composite of true and correct screen captures of the first page results for the search terms "nike," "nintendo," "lululemon," "gucci," "prada," and "jacket" are attached as **Exhibit 43.** These search terms directed to pages with the page title "Temu | Search [name]" where [name] reflected the search term entered. Only the search term "shein" produced an alternate title displaying the SHEIN Mark four times.

54.     Attached hereto as **Exhibit 34** is a true and correct copy of the Declaration of Chris Silver Smith in support of Roadget's Reply in support of its Motion to Supplement Evidence (Dkt. 60-34). In paragraph 16, Mr. Smith states that "[p]age titles are arguably the most important and most influential search engine optimization elements, and inclusion of keywords in page titles can allow those pages to have a much higher chance of ranking prominently when the same keywords are searched upon in search engines such as Google or Bing. Accordingly, when the webpage title 'Shein Cy Starting From $0.49 – Temu' is indexed by search engines, then consumers searching for Shein products on search engines would be presented with this link, which would lead them to the Temu Website."

### **The Infringing EMERY ROSE Page and Products**

55.     On April 26, 2023, and at my direction, a GT employee entered "emery rose", a trademark owned by Plaintiff, into the search bar of the Temu Website and hit "enter." Attached hereto as **Exhibit 35**, and reproduced below, is a true and correct screenshot of the resultant webpage titled "Emery Rose – Buy Reviews On Emery Rose Clothes And Emery Rose Shirts Online With Free Shipping On Temu.":



56.     The product listing for a product entitled "2pcs EMERY ROSE Cow Print Drop Earrings 3 03in 1 49in" was displayed as the second result, and as reproduced below. Attached hereto as **Exhibit 36**, and reproduced below, is a true and correct screenshot of this product listing taken on April 26, 2023:



57.     On June 17, 2023, I directed a user to search for "luvlette bras" on the Temu Website and then hit "enter" on the keyboard. LUVLETTE is also a trademark owned by Plaintiff. Attached as **Exhibit 42** is a true and correct capture of the resultant webpage on the Temu Website titled "Luvlette – Free Returns Within 90 Days – Temu." I directed that user to send the resultant URL through a commonly used messenger app, WhatsApp. Attached as **Exhibit 37** and reproduced below is a true and correct copy of the resultant display:



58.     As can be seen in the screenshot, the sending of the link to another phone user results in a display of the phrase "Luvlette Bras – Temu [/] Find amazing deals on luvlette bras on Temu. Free shipping …"

59.     Another example of Temu's unauthorized use of the LUVLETTE trademark is shown here:



### Methods of Viewing and Purchasing Products on the Temu Website

60.     A user can purchase a product listed on a Temu Website webpage that results from the user's entry of a search term in the webpage's search bar in at least three ways, explained below.

61.     Evidence of these checkout methods was attached to Roadget's Motion to Supplement Evidence (Dkt. 53-2). Temu did not dispute in its response to that motion that in two of these methods, the user is never presented with any seller-identifying information.

### (a) The Quick Look Checkout Process

62.     At my direction, a user hovered over the first product listing displayed on the Infringing Page. The mouseover triggered a dynamic change to the listing, and a "Quick look" button appeared overlaying the listing's image.

63.     At my direction, the "Quick look" button was selected for the first product listing displayed on the Infringing Page, "Casual Drawstring Pantsuits Two-piece Set, Pocket Hoodies Tops & Loose Long Sweatpants Set, Women's Clothing". An overlayed screen appeared as a result (the "Quick Look Screen"). The user then selected the size of the product and then selected the "Add to cart" button in orange on the Quick Look Screen. The user was returned to the Infringing Page. On the right-hand side, the Infringing Page reflected that the item had been added to the user's shopping cart.

64.     At my direction, the user then clicked the orange "Checkout" button in the top right corner, at which point the user was prompted to sign into a Temu account before continuing. A true and correct demonstrative composite of various screen captures reflecting the checkout process through the Quick Look Screen is attached hereto as **Exhibit 38**. At no point was the manufacturer, seller, or brand associated with the product "Casual Drawstring Pantsuits Two-piece

Set, Pocket Hoodies Tops & Loose Long Sweatpants Set, Women's Clothing" displayed in this checkout process.

### (b) The Shopping Cart Icon Checkout Process

65.     Another way in which a user could select and purchase a product from the Infringing Page is by selecting a shopping cart icon that appears beneath the product listing on the Infringing Page (the "Shopping Cart Icon").

66.     At my direction, a user selected the Shopping Cart Icon underneath the first product listing. An overlayed screen appeared over the Infringing Page identical to the Quick Look Screen. The user then selected the size of the product and then selected the "Add to cart" button in orange on the Shopping Cart Icon Screen, which returned the user to the Infringing Page.

67.     At my direction, the user then clicked the orange "Checkout" button in the top right corner, at which point the user was prompted to sign into a Temu account. A true and correct demonstrative composite of screen captures reflecting the checkout process through the Shopping Cart Icon Screen is attached hereto as **Exhibit 39**. At no point was the manufacturer, seller, or brand associated with the product displayed in this checkout process.

### (c)     The Expanded Listing Checkout Process

68.     A third way in which products could be purchased from the Infringing Page is by clicking on image of the product listing directly.

69.     At my direction, a user clicked the first product listing on the Infringing Page. The user was redirected to a new page over which a wheel icon and the text "Spin to win $100 coupon bundle" appeared. The user then clicked the "X" to minimize the overlayed wheel, and the Temu website displayed an expanded version of the product listing from the Infringing Page (the "Expanded Listing Page"). The name of the purported seller could be seen in the top-right corner.

70. At my direction, the user was able to check out in the same fashion as with the other two checkout processes, by selecting a size and clicking the orange "Add to cart" button, and then clicking on the resulting orange "Checkout" button on the right side of the page. The user was then prompted to sign into a Temu account. A true and correct demonstrative composite of screen captures reflecting this third checkout process is attached hereto as **Exhibit 40**.

71. Thus, as shown in **Exhibits 38-40**, unless the user purchases a product by visiting a specific subpage of the Temu website, at no point in the process of selecting and purchasing the product does the Temu website identify the manufacturer, seller, or brand associated with the product.

**Temu's Auto-Populated Recommendations of Search Terms Containing SHEIN Marks**

72. Attached as **Exhibit 41** is a composite of true and correct screenshots of auto-populated search recommendations captured at my general direction by a GT employee on various dates between April and August of 2023. Below is a summary of those captures:

73. On April 18, 2023, when a user typed in "new shei" into the search bar on the Temu Website, the Temu Website recommended "new shei**ncute shirts**."



74. On May 22, 2023, when a user typed in "shei," the Temu Website recommended, *inter alia*, "shei**n glasses**."



75. On April 27, 2023, when a user typed in "shein," the Temu Website recommended, *inter alia*, "shein **retail clothing**," "shein **glasses**," "shein **retail**," and "shein **icon grunge off shoulder ruched crop tee**." At no point did I, a GT employee, or anyone acting at GT's direction, including Plaintiff's expert, Mr. Smith, type into the search bar on the Temu Website "shein icon grunge off shoulder ruched crop tee" or "shein teen girls ribbed rill trim ruched cami top," which are the exact names of products on the Shein Website.



76. "Dupe" (short for "duplicate") is a colloquial word used by fashion and beauty product consumers to refer to a product that appears similar or identical to a genuine product.[2]

77. When a user typed in "dupe she," the Temu Website recommended "dupe she **glam**," referring to Roadget's SHEGLAM mark.



78. When a user typed in "emery," the Temu Website recommended, *inter alia*, "emery **rose**," "emery **rose tops**," "emery **rose dress**," "emery **rose dresses for women**," and "emery **rose clothing women**."

---

[2] *See, e.g.*, Angela Wei, *Lululemon Will Give You Free Leggings In Exchange For Your 'Dupes'*, Fᴀꜱʜɪᴏɴɪꜱᴛᴀ (May 1, 2023), https://fashionista.com/2023/05/lululemon-align-legging-dupe-swap.



79.     On April 25, 2023, when a user typed in "daz," the Temu Website recommended,

*inter alia*, "daz**y**," "daz**y dress**," "daz**y clothes shein**," "daz**y shirt**," and "daz**y t shirt**."



80.     On June 9, 2023, when a user typed in "romw" and "romwe," the Temu Website recommended numerous different auto-completed search terms that displayed the ROMWE mark without the user typing in those terms.



81.    On June 17, 2023, when a user typed in "luvl", the Temu Website recommended, *inter alia*, "luvlette bra", "luvlette nipple cover", "luvlette bra 75e", "luvlette reusable no adhesive silicone nipple cover", and "luvlette brand". On June 17, 2023, when a user typed in "luvle", "luvlet," and "luvlett," the Temu Website recommended similar search terms:





82.     At no point during the course of these investigations did I, a GT employee, or anyone acting at GT's direction, including Plaintiff's expert, Mr. Smith, type into the search bar on the Temu Website "luvlette reusable no adhesive silicone nipple cover" or "luvlette dream curve nonslip strapless bra." "Luvlette Reusable No Adhesive Silicone Nipple Cover" and "Luvlette Dream Curve Non-Slip Strapless Bra" are the exact names of product listings displayed on the Shein Website at https://m.shein.com/us/Luvlette-Reusable-No-Adhesive-Silicone-Nipple-Cover-p-10318040-cat-2208.html?lang=en&ref=m&rep=dir&ret=mus and https://m.shein.com/us/Dream-Curve-Non-Slip-Strapless-Bra-p-11490268-cat-2195.html?lang=en&ref=m&rep=dir&ret=mus.

83.     Temu still continues to display auto-recommended search results for common misspellings of "Shein" and other Affiliate Brand Marks. On July 12, 2023, after Temu filed its opposition to Roadget's motion for a temporary restraining order (Dkt. 79), an employee of GT acting at my general direction captured additional screenshots of auto-populated search recommendations on the Temu Website, the results of which are described in the following paragraphs.

84.     When the employee typed in "luvl" into the search bar on July 12, 2023, the Temu website recommended "luvlett":

48



85.    When the employee typed in "romw" on July 12, 2023 the Temu Website recommended, *inter alia*, "romwewomen dresses clearance":



86. When the employee typed in "shie" on July 12, 2023, the Temu Website recommended, *inter alia*, "shine clothing" and "shienclothing for women":



87. When the employee typed in "shien" on July 12, 2023, and July 14, 2023, the Temu Website recommended, *inter alia*, "shienclothing for women," "shine clothes," "shienclothing for women summer," "shienmens clothes," and "shienclothing for plus size":



88.     I identified these July 2023 examples in my declaration in support of Plaintiff's reply in support of the motion for a temporary restraining order (Dkt. 83-1).

89.     When the employee typed in "shien" and "sheen" on August 4, 2023, similar results were displayed:



**Evidence of Actual Consumer Confusion Appears on the Temu Website**

90.     Attached as **Exhibit 44** is a true and correct screen capture of a Temu listing at https://www.temu.com/round-knotted-stainless-steel-bangle-bracelet-hip-hop-style-hand-jewelry-decor-g-601099513948257.html offering a similar product to a product offered on the Shein Website. The exhibit reflects that on July 2, 2023, a user on the Temu Website left a product review stating: "I love these little bracelets, they are well made an sterling silver..I am putting Charms on my bracelet…it is cute! an I love it! ordered 3 more! Thanks, SheIn!!" This review is reproduced below:



91.     Attached as **Exhibit 45** is a true and correct screen capture of a Temu listing at

https://www.temu.com/au/large-satin-bonnet-blue-floral-print-sleeping-nightcap-shower-cap-

women-elastic-hair-bonnet-turban-cap-g-601099514566680.html offering a similar product to a

product offered on the Shein Website. The exhibit reflects that on May 24, 2023, a user on the

Temu Website left a product review stating: "Very nice and practical, good quality, thank you

SHEIN." This review is reproduced below:



92.     Roadget served requests for production of documents ("RFPs") on Defendants on April 12, May 2, and May 9, 2023, including requests seeking evidence of actual confusion such as WhaleCo RFPs 106, 138, 140, 170, 171, 225, and 228, and equivalent PDD RFPs 108, 136, 138, 166, 167, 173, and 176. True and correct copies of relevant excerpts of Defendants responses to these RFPs are attached as **Exhibits 46-48.** Defendants have not produced any documents responsive to these requests.

93.     The reviews contained in **Exhibits 44 and 45** are responsive to PDD RFP 136 and WhaleCo RFP 138, which seek customer reviews of products sold on Temu's platform that mention the word "Shein." Defendants refused to produce any documents in response to these requests.

94.     As shown in **Exhibits 46-48**, Roadget also propounded RFPs seeking documents reflecting Temu's awareness of the alleged impostor social media accounts before November 8, 2022 (WhaleCo RFP 115; PDD RFP 117); documents reflecting Temu's awareness that the SHEIN MARKS are trademarks (WhaleCo RFPs 130, 132; PDD RFP 131); and communications between Temu and the third-party sellers of the infringing products alleged, including through Temu's "Knock" communications platform, that mention Shein, designs of products sold on the Shein platform, or images of products sold on the Shein platform (WhaleCo RFP 184; PDD RFP 5). Defendants have not produced any documents in response to these requests. Nor have Defendants have produced any documents that would tend to show a lack of willfulness or intent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on this 7th day of August, 2023, in Los Angeles, California.

_/s/ Nina D. Boyajian_
Nina D. Boyajian